# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DINA JAEGER,<br>        Plaintiff,<br><br>        v.<br><br>CELLCO PARTNERSHIP d/b/a VERIZON<br>WIRELESS, and THE CONNECTICUT<br>SITING COUNCIL,<br>        Defendants. | CIVIL ACTION NO.<br>3:09CV567 (SRU) |

## <u>RULING AND ORDER</u>

Dina Jaeger brought this action to enjoin the March 12, 2009 decision and order of the

Connecticut Siting Council ("Council") granting Cellco Partnership d/b/a Verizon Wireless

("Cellco") a Certificate of Environmental Compatibility and Public Need for the Construction,

Maintenance and Operation ("Certificate") of a personal wireless service facility ("cellular

tower") at 188 Route 7, Falls Village, Connecticut.  Jaeger's six-count complaint alleges, *inter*

*alia*, violations of the International Migratory Bird Treaty, the Migratory Bird Treaty Act

("MBTA"), the Bald and Golden Eagle Protection Act ("BGEPA"), the Telecommunications Act

("TCA"), and the 10th and 14th Amendments to the U.S. Constitution.

In her first and second claims for relief, Jaeger alleges that the construction and operation

of the cellular tower will result in harmful radio frequency emissions ("RF emissions") causing

impermissible harm to protected fowl in violation of the MBTA and the BGEPA.  She also

claims that the Council violated Section 704(a) of the Telecommunications Act ("TCA"),

codified at 47 U.S.C. § 332(c)(7), in rejecting her proposal to modify or relocate the personal

wireless facility without an adequate explanation.  *See* 47 U.S.C. § 332(c)(7)(B)(iii).  Jaeger's

third claim for relief alleges that the construction and operation of the cellular tower will result in

harmful RF emissions causing impermissible harm to humans.  She seeks a declaratory judgment

that "under 47 U.S.C. § 332(c)(7)(B)(iv), in making decisions regarding the placement of

[cellular towers], States and local governments in the performance of their police power

responsibilities to protect the health, safety, and welfare of their citizens are not prohibited from

taking into account non-thermal biological effects of RF radiation to the extent that they are not

presently covered by the FCC's safety regulations."   Her fourth claim makes additional

allegations concerning human health and she seeks a declaratory judgment "defining her

constitutional right to protect herself and her children from government approval of potentially

harmful wireless RF radiation from cell towers."  Jaeger's fifth claim for relief alleges that the

Council violated the criteria set forth in *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630 (2d Cir.

1999), by failing to articulate a public need for the cellular tower.  Her sixth claim for relief seeks

a declaratory judgment stating that Conn. Gen. Stat. § 16-50v, the statute setting forth the

funding scheme for the Council, is unconstitutional.

Defendants move to dismiss Jaeger's claims (**docs. ## 16, 23**) on several grounds.[1]  First,

defendants maintain that Jaeger failed to exhaust her state administrative remedies, and therefore

the court should abstain from considering all of her claims.  Second, defendants claim the

Council is preempted from considering the environmental effects of radio-frequency emissions

under the TCA, and therefore Jaeger's first through fourth claims for relief must fail.

Additionally, defendants argue that Jaeger lacks standing under the MBTA and BGEPA to bring

---

[1] Defendants filed separate motions but move for dismissal on substantially similar bases, and incorporate each others arguments, therefore I consider their motions together.  The Council's motion is treated as a motion for judgment on the pleadings because the Council had already filed its answer.

her first two claims for relief.  Lastly, defendants maintain that Jaeger's fifth and sixth claims for

relief fail as a matter of law.  Jaeger filed a cross-motion for summary judgment in opposition to

the motions to dismiss (**doc. # 25**).

I heard oral argument on the motions on October 7, 2009.  For the following reasons,

defendants' motions to dismiss (**docs. ## 16, 23**) are **granted**.  Because defendants' motions to

dismiss are granted, I need not reach the merits of Jaeger's motion for summary judgment (**doc. #

25**), and therefore it is **denied as moot**.

I.   <u>Standard of Review</u>

Defendants move to dismiss the complaint both for lack of standing and for failure to

state a claim.  The party who seeks to exercise the jurisdiction of the court bears the burden of

establishing the court's jurisdiction.  *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir.

1994).  To survive a motion brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure,

a plaintiff must clearly allege facts demonstrating that the plaintiff is a proper party to seek

judicial resolution of the dispute.  *Id*.  Although the plaintiff bears the ultimate burden of

establishing jurisdiction by a preponderance of the evidence, "until discovery takes place, a

plaintiff is required only to make a prima facie showing by pleadings and affidavits that

jurisdiction exists."  *Koehler v. Bank of Bermuda*, 101 F.3d 863, 865 (2d Cir. 1996).  "When

considering a party's standing, we 'accept as true all material allegations of the complaint, and

must construe the complaint in favor of the complaining party.'"  *Thompson*, 15 F.3d at 249

(quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  If a plaintiff has failed to allege facts

supportive of standing, it is within the court's discretion to allow or to require the plaintiff to

supply, by amendment to the complaint or by affidavits, further particularized allegations of fact

deemed supportive of standing.  *Id*.

When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether the plaintiff has set forth a plausible claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007); *Iqbal v. Hasty*, 129 S. Ct. 1937 (2009); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

II.    Factual Background

The following facts are taken from Jaeger's complaint (**doc. # 1**) ("Compl.") and for the purposes of this ruling are assumed to be true.  On March 12, 2009, the Council granted Cellco the Certificate for the construction, maintenance and operation of a cellular phone tower located at 188 Route 7 South, Falls Village, Connecticut.  (Compl. 3.)  Jaeger was granted intervenor status by the Council in the certification proceeding.  *Id.*  Jaeger is the mother of two minor children and lives 1290 feet in a straight line from the proposed cellular tower.  (Compl. 5.)  She is also co-owner of undeveloped land located across Route 7 from the cellular tower site.  (Compl. 5-6.)  The market value of both properties would be adversely impacted by the construction of the tower.  (Compl. 6.)  Jaeger is an active recreational birdwatcher and, as a Native American, she draws spiritual inspiration and religious guidance from the sightings of bald eagles and other wildlife.  *Id.*

Cellco is licensed by the FCC to operate a wireless communication system in the state of Connecticut.  *Id.*  Cellco acquired Alltel's cellular license for Litchfield County and a license to provide service in the 700MHz frequency band for 4G wireless service.  *Id.*  The Council granted Cellco the certificate without a showing of the potential environmental impact.  *Id.*  The Council

has exclusive jurisdiction to determine the placement of wireless telecommunications facilities in Connecticut. *See* Conn. Gen. Stat. § 16-50g.

The Council held a public hearing on July 1, 2008, which was continued until July 31, 2008. (Compl. 6.) At the hearing, Jaeger introduced evidence to the Council that wireless transmission facilities negatively impact persons and wildlife living near them. (Comp. 12-13.) Jaeger submitted a document to the Council showing that more than two hundred migratory birds have been sighted in the area near the proposed cellular tower site. (Comp. 7.) The Council rejected the studies submitted by Jaeger concerning cell towers and their effects on the health of birds. (Compl. 8 -9.) Jaeger also submitted evidence that the proposed cellular tower location would violate the BGEPA. She provided the Council with the Balmori Study stating that "animals are very sensitive electrochemical complexes that communicate with their environment through electrical impulses. . . . The low intensity pulsed microwave radiation from cellsites produces subtle athermal influences on living organisms . . . research has shown such effects on the living organisms at molecular and cellular levels on immune processes, in DNA, on the nervous, cardiac, endocrine, immune and reproductive systems . . . ." (Compl. 8.) She also submitted to the Council proposed findings of fact dated September 2, 2008, which included the following statement on bird health effects: "Scientific studies offered in evidence by Intervenor show that the operation of cell transmission antennas can: (a) interfere with migratory birds' natural navigation systems causing tower strikes and fatalities after dark; (b) prevent migratory bird nesting and reproduction within 200 meters of cell towers; and (c) cause infertility in small animal food sources in migratory bird habitats." (Compl. 9, internal citations omitted).

Similarly, Jaeger introduced a number of studies that demonstrate that humans living near

cellular towers experience headaches, vertigo, visual disturbances, irritability, loss of memory, dizziness, restlessness, lethargy, and other ailments.  (Compl. 13-14.)  The FCC guidelines establishing safe RF emission levels are no longer accurate.  (Compl. 16).  The Council approved Cellco's application without a finding of a pubic need, and despite the evidence that the proposed site is served by other cellular service providers.  (Compl. 18-19).

The Council is a self-funded agency and recovers administrative fees via an assessment levied against those who provide communications services and those who have come before the council in the preceding year.   The Council also charges fees for each application for a certificate for a facility.  Current payment levels for Council members include a per diem fee of $150 for attending hearings, not to exceed $12,000 a year.  The Council held a Christmas party in 2008 and invited Cellco's attorney and corporate representative.  (Compl. at 22-23.)

III.   Discussion

   A.   Abstention

   Jaeger has also appealed from the Council's decision to the Connecticut Superior Court. Defendants argue that Jaeger's federal claims concern ongoing state proceedings, that the siting of cellular towers is an important state function, and that the state courts are courts of general jurisdiction.  Therefore, defendants argue, the federal court forum is unnecessary and duplicitive. For those reasons, defendants urge me to abstain from hearing this matter.  Federal courts, however, are under no duty to abstain simply because of the pendency of parallel litigation.  The circumstances of the instant action are not exceptional and do not warrant abstention.  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Additionally, where a plaintiff seeks declaratory relief with respect to federal rights, as Jaeger

does here, the court's exercise of jurisdiction is wholly discretionary.  *Wilton v. Seven Falls*, 515

U.S. 277 (1995); *Brillhart v. Excess Insurance Co.*, 316 U.S. 491 (1942).  Accordingly, I decline

to abstain from exercising jurisdiction in this case.

### B.    The Effects of RF Emissions

Defendants' maintain that, to the extent that Jaeger's first four claims for relief attack the

Council's failure to deny Cellco's application on the basis of RF emissions, Jaeger fails to state a

claim upon which this court can grant relief because the Section 704 of the TCA preempts the

Council's authority to render siting decisions on the basis of RF emissions.  *See* 47 U.S.C. §

332(c)(7)(B)(iv).   In her complaint Jaeger maintains that the Council failed to consider the

evidence she presented concerning the health effects of RF emissions on humans and wildlife.

Additionally, she claims that the FCC's regulation of RF emissions is outdated, thus nullifying

any preemptive effect of the TCA.  She further argues that, to the extent the Council is preempted

from regulating cellular tower placement on the basis of RF emissions, the Council is not

preempted from rendering a siting decision based on the impact of RF emissions on migratory

birds.  In light of the studies presented, she argues that the Council erred in failing to adopt her

proposed finding of fact that the cellular tower should be relocated or co-located with existing

towers to prevent harm from RF emissions.  Because Jaeger's first four claims challenge the

Council's siting determination on the basis of the effects of RF emissions, they fail as a matter of

law; the Council is preempted by the TCA from denying an application on the basis of the effects

of RF emissions that fall within the permissible range set by the FCC.

### 1.    *The Telecommunications Act of 1996*

Congress enacted the TCA "to provide a pro-competitive, de-regulatory national policy

framework designed to accelerate private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition. . . ." *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.2d 490, 493 (2d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-458, at 206 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124.)  The TCA sets forth a regulatory scheme for state and local authorities responsible for determining whether a cellular phone tower may be built.  *See* 47 U.S.C. § 332(c).  Section 332(c)(7)(A) gives local and state zoning authorities general authority "over decisions regarding the placement, construction, and modification of personal wireless service facilities."  The delegated authority to regulate cellular towers is limited, however, and there "is no doubt that Congress may preempt state and local governments from regulating the operation and construction . . . of personal wireless communications facilities."  *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 96 (2d Cir. 2000)*, cert. denied*, 531 U.S. 1070 (2001).

Indeed, 47 U.S.C. § 332(c)(7)(B) circumscribes the regulatory authority of state and local governments, providing that the regulation of the placement, construction, and modification of cellular towers by any State or local government shall: (1) not unreasonably discriminate among providers; (2) not prohibit or have the effect of prohibiting the provision of personal wireless services; (3) act on a request within a reasonable period of time; and (4) render a denial in writing and supported by substantial evidence contained in a written record.  Additionally, subsection 332(c)(7)(B)(iv) preempts state and local governments from regulating personal wireless service facilities on the basis of health effects of RF emissions.  *See Cellular Phone Taskforce*, 205 F.3d at 96.  Specifically, section 332(c)(7)(B)(iv) states that "[n]o state or local government or instrumentality thereof may regulate the placement, construction, and

modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions."[2]  Further, section 332(c)(7)(B)(v) dictates that "any person adversely affected by an act or failure to act by a State or local government" that is inconsistent with section 332(c)(7)(B)(iv) may petition the FCC for relief.

In *Cellular Phone Taskforce*, the Court addressed challenges to two FCC final opinions and orders.  The first established guidelines for health and safety standards of RF emissions, and the second set forth compliance guidelines under the National Environmental Policy Act (NEPA).   The Court held, in part that, with respect to setting safety standards, the FCC acted reasonably in relying on the American National Standards Institute (ANSI) and National Council on Radiation Protection and Measurements (NCRP), and in interpreting the preemption provision of the Telecommunications Act of 1996, and that the preemption provision of the Telecommunications Act of 1996 did not violate the Tenth Amendment.  *See generally Cellular Phone Taskforce*, 205 F.3d at 82.  The Court stated that Section 332(c)(7)(B)(iv) "preempt[s] state and local governments from regulating the placement, construction or modification of personal wireless service facilities on the basis of the health effects of RF radiation where the facilities would operate within levels determined by the FCC to be safe."  *Id.* at 88; *see also Sprint Spectrum L.P. v. Mills,*  283 F.3d 404, 417 (2d Cir. 2002)

2.      *Human Health Effects*

Jaeger does not dispute that the TCA preempts the Council from making siting decisions

---

[2]  To the extent that the FCC promulgates orders and regulations under the TCA, it is established that "the FCC has broad preemption authority" under the TCA.  *See City of New York v. FCC*, 486 U.S. 57, 63-64 (1988); *see also Cellular Phone Taskforce,* 205 F.3d at 96.

based on human health effects of RF emissions.  (Doc. 20 at 7).   Instead, she maintains, in her third and fourth claims for relief, that in light of the studies provided to the Council, it is evident that the FCC's established guidelines for RF emissions are outdated and fail to account for non-thermal RF emissions.  Accordingly, she argues, the Council was not preempted from denying Cellco's application on the basis of human health effects of non-thermal RF emissions. Additionally, she alleges that, even if the TCA preempts the Council from considering the human health effects of RF emissions, up-to-date research "invalidates and nullifies the preemption clause by removing its underlying premise – the FCC guidelines must provide 'adequate safeguards.'" (Compl. 16-17.)  For the following reasons, Jaeger's arguments fail, and defendants' motion to dismiss claims 3 and 4 is granted.

It is clear that the FCC has considered the effects of non-thermal RF emissions.  The FCC promulgated exposure limits that are set forth in 47 C.F.R. § 1.1310, Table 1.  The parties do not dispute that Cellco's proposed tower will not exceed the RF emission limits established by the FCC.  The recommended guidelines consider exposure limits published by the National Council on Radiation Protection and Measurement (NCRP) and the American National Standards Institute (ANSI).  *See* 47 C.F.R. § 1.1310.  The FCC relied on findings by the NCRP and ANSI in issuing the Second Order, 12 F.C.C. Rcd. 13494 at p. 31, 1997 WL 522796, which states:

> [the] guidelines are based on recommendations of expert organizations and federal agencies with responsibilities for health and safety. It would be impracticable for us to independently evaluate the significance of studies purporting to show biological effects, determine if such effects constitute a safety hazard, and th[en] adopt stricter standards than those advocated by federal health and safety agencies. This is especially true for such controversial issues as non-thermal effects and whether certain individuals might be "hypersensitive" or "electrosensitive."

The ANSI concluded that "no reliable scientific data exist indicating that [n]onthermal . . . exposure may be meaningfully related to human health."  The NCRP found that the existence of non-thermal effects "is clouded by a host of conflicting reports and opinions."  *See Cellular Phone Taskforce*, 205 F.3d at 90.

The NCRP and ANSI findings were upheld in *Cellular Phone Taskforce*, where petitioners, as Jaeger does here, argued that the FCC guidelines were outdated and failed to account for non-thermal effects of the RF emissions, and therefore were arbitrary and capricious. The Second Circuit held that the FCC, relying on the NCRP and ANSI, had considered the non-thermal effects of RF emissions, and the FCC's reliance on the challenged findings was not arbitrary and capricious.  *Id*.  The Court concluded that, even though experts may disagree, the FCC is the entity with the express authority to regulate acceptable RF emissions levels for cellular tower facilities.  The "argument that the FCC should create greater safety margins in its guidelines to account for uncertain data is a policy question, not a legal one."  *Id*.  The Court stated that "an agency confronted with scientific uncertainty has some leeway to resolve the uncertainty by means of more regulation or less."  *Id.* at 91.

At oral argument, Jaeger suggested that the Council, in light of the evidence presented to it concerning human health effects, should have *sua sponte* denied Cellco's application on any other available ground.  Because the TCA does not act as a complete bar to local and state regulatory authority, Jaeger is correct that the Council could have denied Cellco's application on other grounds.  The Second Circuit has held that the Council is not prohibited from considering other factors in siting and has discretion to approve or deny a proposal for reasons other than the effects of RF emissions.  *See* 47 U.S.C. § 332(c)(7)(A);  *Cellular Phone Taskforce*, 205 F.3d at

-11-

96.

The Second Circuit and, recently, the Ninth Circuit have upheld local and state government regulation of towers under Section 332(c)(7)(A). *See Sprint PCS Assets, LLC v. City of Palos Verdes Estates*, 583 F.3d 716 (9th Cir. 2009) (holding that a denial of an application for a wireless transmission facility on aesthetic grounds was permissible under the TCA); *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404 (2d Cir. 2002) (holding that a lease agreement restricting RF emissions was permissible under the TCA).   In *Mills*, a wireless provider (Sprint) sought to compel a school district to allow it to place a tower on a high school roof pursuant to an *existing* lease agreement. The parties disputed the terms of the lease agreement.  Sprint had informed the school district that it needed to change the specifications of the proposed tower and as a result the RF emissions would be higher than agreed upon but still remain with the FCC regulated limits. The school district objected to that change.  The District Court held that, under the TCA and *Cellular Phone Taskforce,* the school district could not regulate the tower on the grounds of RF emissions and enjoined the school district.  After engaging in a thorough discussion of *Cellular Phone Task Force* and the reach of  TCA's preemption, the Second Circuit held, on appeal, that the TCA does indeed preempt regulation on the basis of RF emissions, but it does not preempt mutually agreed upon provisions in a lease agreement, even if the terms of the lease agreement embodied stricter RF emission limits than those provided by the FCC.  Nonetheless, the discussion concerning *Cellular Task Force* reiterated the Court's previous position that local and state governments cannot make siting determinations based solely on the effects of RF emissions. *See also Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490 (2d Cir. 1999) (holding that, where the record shows that human health effects were the only basis for denying a cellular

tower application, the denial is overturned despite local government's claims the denial was based on aesthetic and property value concerns).

Here, Jaeger specifically sought a siting decision based on potentially adverse health effects of RF emissions. It is clear that the TCA preempts local and state regulation of cellular towers solely on the basis RF emissions. Furthermore, there is no support for her assertion that the Council is obligated to consider all possible bases for denying an application, even if those bases are not raised by a petitioner. Because state and local authorities may not make siting decisions based on fears that RF emissions from cellular towers pose environmental risks, so long as the RF emissions fall within FCC established guidelines, *Cellular Phone Taskforce v. FCC*, 205 F.3d at 96, claims one, two, three and four of Jaeger's complaint fail.

3.      *Jaeger's Proposal*

In her first claim, Jaeger alleges that she and others proposed that Cellco's personal wireless service facilities be placed at a "different and safer location in order to protect the schoolchildren, nearby residents, migratory birds, eagles and other threatened species." (Compl. 10 at ¶ 24). The Council's denial of that proposal without a written decision and adequate explanation, Jaeger maintains, violated section 332(c)(7)(B)(iii). *Id*. Section 332(c)(7)(B)(iii) provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

Jaeger's claim under section 332(c)(7)(B)(iii) fails for several reasons. First, Jaeger's complaint concerns the *granting* of Cellco's application and not the *denial* of her proposal; Jaeger did not propose that a tower be constructed in any particular location, only somewhere

other than where Cellco sought to place one.  Recently, a court of this circuit observed that

section 332(c)(7)(B)(v) "limits the right to bring a federal claim to persons affected by a narrow

set of actions by a state or local planning board."  *See Drago v. Garment,* 2010 WL 769692 at *3

(S.D.N.Y. March 2, 2010).  Noticeably absent from section 332(c)(7)(B)(v) is any language

allowing one to "bring an action in federal court for the adverse affects flowing from the granting

of a request to construct a personal wireless service facilities."  *Id.* at *4.

Second, to the extent that Jaeger presented the Council with a proposal to relocate

Cellco's cellular tower, it is clear that Jaeger is not a provider of wireless services under the

terms of the TCA.  Section 332(c)(7)(B) governs the "regulation of the placement, construction,

and modification of personal wireless service facilities. . . ."  The term "personal wireless

services" is defined as "commercial mobile services, unlicensed wireless services, and common

carrier wireless exchange access services."  *See* 47 U.S.C. § 332(c)(7)(C)(i).  The term "personal

wireless service facilities" as defined in section 332(c)(7)(C)(ii) "means facilities for the

provision of personal wireless services."  Section 332(c)(7)(B)(iii) requires only a decision in

writing where a denial to place, construct, or modify a personal wireless service facilities has

been issued.  Jaeger is not a commercial mobile service, an unlicensed wireless service nor a

common carrier wireless exchange service.  As such, she is not an entity making a proposal to

place, construct, or modify a personal wireless service facility as set forth in section

332(c)(7)(C)(ii).  Jaeger seeks only to force Cellco relocate an already proposed facility on the

basis of studies concerning the effects of RF emissions on human and wildlife health.

Lastly, even if Jaeger could bring a claim under section 332(c)(7)(B)(iii) because she

arguably proposed a "modification" by requesting the tower be relocated to a place not near her

home, that claim is based on the argument that the Council failed to consider the safety of the environment around the tower, specifically, the effects of RF emissions. *See* Compl. 10 at ¶ 24. As discussed above, the Council is preempted under the TCA from basing a siting decision on the effects of RF emissions. Thus, Jaeger's claim that the Council rendered a siting decision despite the evidence in the record concerning the effects of RF emissions and that the Council improperly denied her request to modify or relocate Cellco's personal wireless service facility to a safer location necessarily fails.

      4.    *"Environmental Effects"*

     At oral argument and in her opposition papers, Jaeger conceded that the TCA does preempt the regulation of cellular transmission towers on the basis of RF emissions. (Doc. # 20 at 7.) She maintains, however, that the term "environmental effects" in section 332(c)(7)(B)(iv) limits the FCC's regulation of RF emissions to human health effects and, therefore, the Council is free to consider the health effects of RF emissions on migratory birds and other wildlife. Plaintiff's interpretation of section 332(c)(7)(B)(iv) is flawed for a number of reasons. First, a plain reading of the statute makes clear that the TCA preempts local and state authorities from regulating the placement of cellular towers on the basis of the environmental effects of RF emissions. Second, the reading Jaeger seeks would grant the Council authority to regulate cellular tower siting on the basis of RF emissions, a reading wholly irreconcilable with the preemptory language of the TCA and the holding in *Cellular Phone Taskforce*.

     When asked to construe a statute, the court begins with its plain language. *See Barnhart v. Sigmon Coal Co., Inc*., 534 U.S. 438, 450 (2002); *see also Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be

sought in the language in which the act is framed, and if that is plain, and if the law is within the

constitutional authority of the lawmaking body which passed it, the sole function of the courts is

to enforce it according to its terms.").  The court must first determine if the language at issue has

a plain and unambiguous meaning.  *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997).  If

so, the court's inquiry ends.  *See In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 188 (2d Cir.

2002) ("[I]it is axiomatic that the plain language of a statute controls its interpretation, and that

judicial review must end at the statute's unambiguous terms.").

       The term "environmental effects" is defined as the "natural or artificial disturbance of the

physical, chemical, or biological components that make up the environment."  *See* Black's Law

Dictionary, 238 (2d ed. 2001).[3]  There is no dispute that migratory birds, bald eagles and other

wildlife are biological components of the environment.  The court recognizes, however, that no

other court has explicitly considered whether the term "environmental effects" includes effects

beyond those on human health.  *See Cellular Telephone Company v. Town of Oyster Bay*, 166

F.3d 490 (2d Cir. 1999) (holding that environmental effects include human health effects.)  A

review of the regulations under which the FCC sets acceptable RF emission levels and

determines environmental compatibility of transmission facilities makes plain that the FCC does

indeed consider the health effects of RF emissions on wildlife.  The FCC, in approving the

construction of a facility, is required to consider the environmental impact of facilities located: in

---

[3] Although not defined in section 332, Congress promulgated the following definition of
"adverse environmental effect" in its regulation of air pollution: "the term 'adverse
environmental effect' means any significant and widespread adverse effect, which may
reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse
impacts on populations of endangered or threatened species or significant degradation of
environmental quality over broad areas."  *See* 42 U.S.C. § 7412.

an officially designated wilderness area, in a wildlife preserve, where they may affect listed threatened or endangered species or designated critical habitats, or where they are likely to jeopardize the existence of any proposed endangered or threatened species or likely to result in the destruction of critical habitats. *See* 47 C.F.R. § 1.1307. The FCC requires any facility that is sited in any of the above noted areas to submit an environmental assessment. *Id.* The environmental assessment "shall deal specifically with any feature of the site which has special environmental significance (e.g., wilderness areas, wildlife preserves, natural migration paths for birds and other wildlife, and sites of historic, architectural, or archeological value)." 47 C.F.R. § 1.1311(b).

Additionally, any suggestion that the court should interpret the meaning of "environmental effects" in a manner that circumscribes the FCC's preemptive authority under section 332(c)(7)(B)(iv) is arguably an attempt usurp the FCC's authority to regulate RF emissions, a task Congress has delegated to the FCC. Because Congress has granted the FCC authority to regulate RF emissions from cellular towers, where a party's true claim is against the FCC and its policies concerning RF emissions, as it is in the instant matter, the proper procedure is to petition the FCC. *See* 47 C.F.R. § 1.1307(c) ("If an interested person alleges that a particular action, otherwise categorically excluded, will have a significant environmental effect, the person shall submit to the Bureau responsible for processing that action a written petition setting forth in detail the reasons justifying or circumstances necessitating environmental consideration in the decision-making process."). If an aggrieved party takes issue with the FCC order, the proper appellate forum is the Court of Appeals. *See* 47 U.S.C. § 402 ("[a]ny proceeding to enjoin, set aside, annul or suspend any order of the [FCC] . . . shall be brought as

provided by and in the manner prescribed in chapter 158 of Title 28"); 28 U.S.C. § 2342 ("the court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the [FCC]. . . .").

Jaeger's interpretation of "environmental effects" as limited only to humans would result in an application of section 332(c)(7)(B)(iv) that is clearly at odds with Congressional intent and FCC policy on RF emissions.  The plain meaning of the term "environmental effects" incorporates adverse effects on all biological organisms.  Accordingly, the Council is preempted, under the TCA, from rendering a siting decision on the basis of the health effects of RF emissions on widlife, including migratory birds and bald eagles.

     5.     *The MBTA and BGEPA*

In addition to her claims under the TCA, Jaeger argues, in her first two claims for relief, that the construction of the cellular tower will result in impermissible harm to migratory birds and bald eagles in violation of the MBTA and the BGEPA.  The statutes that implement the MBTA and the BGEPA are criminal statutes setting forth a scheme of strict liability for parties responsible for the death of protected birds.  *See United States v. FMC Corporation*, 572 F.2d 902, 907-08 (2d Cir. 1978); *Defenders of Wildlife v. Administrator EPA*, 882 F.2d 1294, 1301-02 (8th Cir. 1989).  *See also* 16 U.S.C. §§ 703-712 and 668 (criminalizing the killing, taking, capturing or selling of migratory birds and eagles respectively).

Private plaintiffs may, via the Administrative Procedure Act ("APA"), pursue claims against federal agencies for failure to adhere to the MBTA and BGEPA.  *See* 5 U.S.C. § 701; *see also Fund for Animals v. Norton,* 374 F. Supp. 2d 91, 98 (D.C. Cir. 2001); *Hill v. Norton,* 275 F.3d 98, 103 (D.C. Cir. 2001); *Humane Society of the United States v. Glickman,* 217 F.3d 882

(D.C. Cir. 2000).   A private plaintiff, however, may not sue state or municipal agencies under

the APA.  *See* 5 U.S.C. § 701(b)(1) ("'agency' means each authority of the Government of the

United States"); *see also Hunter v. Underwood*, 362 F.3d 468, 477 (8th Cir. 2004); *Western State

University of California v. American Bar Ass'n.*, 301 F. Supp. 2d 1129, 1133 (C.D. Cal. 2004).

Because Jaeger lacks standing to enforce violations of the MBTA and BGEPA claims against a

state entity and private company, her claims pursuant to those statutes must fail.

> ### C.    Public Need

In her fifth claim for relief, Jaeger alleges that the Council failed in its March 12, 2009

Decision and Order to make a finding that Cellco's tower filled a public need within the criteria

set forth by the Second Circuit in *Sprint Spectrum v. Willoth*, 176 F.3d 630 (2d Cir. 1999).

Defendants maintain that there is no requirement that the Council make a finding of public need

under the holding of *Willoth* nor under the terms of the TCA.  Defendants argue that *Willoth* does

not stand for the proposition that the TCA affirmatively requires a wireless service provider to

show that the geographic area is inadequately served in order for the regulatory body to grant an

application.  I agree with the defendants.

In *Willoth,* Sprint proposed to construct three cell towers at sites in the town of Ontario,

NY.  The town denied the application and Sprint appealed, alleging that the town did not provide

a good basis for the denial.  Sprint claimed an entitlement under the TCA to construct as many

towers as it deemed necessary for competitive business.  The Court flatly rejected that argument,

and confirmed the authority of the town to reject cellular tower applications under the TCA.  The

*Willoth* Court held that nothing in the TCA indicates that local and state governments cannot

consider the quality of existing services, the number of existing towers and less intrusive means

of providing wireless coverage.  Under *Willoth*, local governing bodies can deny applications for

cellular towers for a variety of reasons under 47 U.S.C. § 332(c)(7), so long as the denial does

not violate the prohibition on regulating RF emissions.  The holding in *Willoth*, however, does

not dictate that the Council must find a public need in approving an application.

Jaeger argues in her opposition papers that "[o]nce an area is sufficiently serviced by a

wireless service provider, the right to deny applications becomes broader.  State and local

governments may deny subsequent applications without thereby violating subsection B(i)(II) of

the TCA."[4]  (Doc. 20 at 29).  The 3rd Circuit, she maintains, articulated in *APT Pittsburgh LTD*

*Partnership v. Penn Township*, 196 F.3d 469 (3d Cir. 1999), that *Willoth* requires a cell tower

applicant to show that the manner in which it proposes to fill a service gap is the least intrusive.

The *APT* Court actually held that, in order for the wireless provider to show a *denial* violated

section 332, the provider must demonstrate a significant gap in service in a particular area and

that the manner in which it proposes to fill the significant gap in service is the least intrusive.

Nothing in *Willoth* nor *APT* requires local and state governments to articulate a finding of a

public need in *approving* cell tower applications.  Jaeger, therefore, cannot sustain a claim under

*Willoth* that the Council failed either to articulate a finding of public need or to find that Cellco's

proposed tower is the least intrusive option to provide wireless services in that area.

### D.      Due Process

Jaeger's sixth claim for relief alleges that Conn. Gen. Stat. § 16-50v, which sets forth the

---

[4]Section 332(c)(7)(B) Limitations:
**(i)** The regulation of the placement, construction, and modification of personal wireless
service facilities by any State or local government or instrumentality thereof– . . .
**(II)** shall not prohibit or have the effect of prohibiting the provision of personal wireless
services.

funding scheme of the Council, is unconstitutional and impairs her due process rights to have her grievances impartially heard.  Jaeger maintains that the funding mechanism of the Council creates a conflict of interest in that the Council has a financial motivation to approve personal wireless facilities.  The more facilities the Council approves, she argues, the more it can increase its budget.  Thus, according to Jaeger, the Council has no incentive to treat an intervenor with equal consideration.  Because the Council's funding mechanism inclines it to rule in favor of the industry participants who fund the Council, Jaeger argues she was deprived of a fair opportunity to be heard by the Council.

Defendants characterize the funding scheme as the collection of user fees, arguing that user fees may reasonably support the budget of a governmental unit that operates facilities that bear at least a "functional relationship" to facilities used by the fee payers.[5]  It may be that the fees and assessments collected by the Council are merely user fees.  Jaeger is not challenging the constitutionality of charging user fees; she challenges the Council's collection of its sole source of revenue directly from the entities it is charged with regulating.  The constitutionality of the Council's funding mechanism appears to be a matter of first impression and the issue turns, not on the constitutionality of user fees, but on whether the funding scheme creates a direct conflict of interest that denied Jaeger due process.

Jaeger's attack on section 16-50v appears to be a facial challenge to the constitutionality of the statute.  A plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in

---

[5]  *See Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority,* 567 F.3d 79, 87 (2d Cir. 2009); *see also Automobile Club of New York, Inc. v. Port Authority*, 887 F.2d 417, 421 (2d Cir. 1989).

all of its applications." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Courts are instructed

that, "in determining whether a law is facially invalid, [they] must be careful not to go beyond the

statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."  *See*

*Washington State Grange v. Washington State Republican Party,* 128 S. Ct. 1184, 1190 (2008),

citing *United States v. Raines*, 362 U.S. 17, 22 (1960).

Under the statutory framework, the Council generates an anticipated budget, the budget is

reviewed by the General Assembly, and once approved, the Council covers its anticipated

expenses by apportioning application fees and assessments among existing and proposed

communications providers.  The fees charged are considered recovered administrative expenses.

*See* Conn. Gen. Stat. § 16-50v.  In section 16-50v(c), the statute requires the Council to refund

any payments received from a provider in excess of expenses attributed to it.  Section 16-

50v(b)(1) caps the collected assessments at $1.5 million.  *See also* Op. Att'y Gen. No. 2006-009a

(2006), 2006 WL 1280872 (concerning the Council's annual cap on assessments).[6]

Section 16-50v makes clear that all of the Council's revenues are derived solely from

cellular tower owners and service providers.  Indeed, the owner/provider-paid expenses are the

sole source of funds for the salaries of the Council members and its executive director.  The

members are paid a per diem  of $150 for attending meetings, up to a maximum of $12,000 per

year.[7]  The Council's website states that it does not receive funding from the state's general fund;

---

[6] At the time the Attorney General issued that opinion, the annual cap on assessments was
set at one million dollars.  On July 6, 2007 the Connecticut Legislature increased the annual cap
on assessments to one million five hundred thousand dollars.  2007 Conn. Legis. Serv. P.A.
07-222, §§ 5 to 7, eff. July 6, 2007.

[7] The statute does not set forth the income of the members and the court could not find
support for these numbers on the Council's website.  In any event, these facts, which are set forth

in other words, the Council does not receive taxpayer dollars to fund its operation.  *See*

Connecticut Siting Council-About Us, http://www.ct.gov/csc/cwp/view.asp?a=895&q=248310

(last visited March 11, 2010).  There are a multitude of personal wireless service owners.  *See*

Telecommunications Database-Comprehensive List of Sites,  *available at*

http://www.ct.gov/csc/cwp/view.asp? a=895&Q=248312&cscNav=| (last visited March 11,

2010)  The types of tower owners cover the spectrum of established telecommunications

companies, municipalities, energy companies, privately owned businesses, non-profits, churches

and citizen homeowners.  *Id.*  Cellco itself owns or shares ownership of at least eleven personal

wireless facilities.  *Id.*  Verizon itself owns or shares ownership of an additional 34 personal

wireless facilities.  *Id.*

   Jaeger's attack on the constitutionality of section 16-50v has surface appeal.  Arguably,

the owner/provider funding of the Council represents a conflict of interest that places an

intervenor like Jaeger, who opposes tower construction, at a distinct disadvantage.  Under the due

process clauses of the Fifth and Fourteenth Amendments, parties and the public are entitled to

tribunals free of personal bias; this requirement is applicable to administrative agencies in much

the same way as it is applicable to courts.  *See MFS Securities Corp. v. S.E.C.*, 380 F.3d 611, 617

(2d Cir. 2004).  Here, the Council acts as an adjudicator on siting issues and as the agency

standing between the communications industry and private citizens with adverse interests.  The

Council is obligated to decide applications in a neutral manner.  Due process demands strict

impartiality on the part of those who function in judicial or quasi-judicial capacity.

Administrators serving as adjudicators are presumed to be unbiased, but that presumption can be

---

in Jaeger's complaint, are accepted as true for the purposes of this ruling.

rebutted by showing of disqualifying interest, either pecuniary or institutional, and the burden of

establishing disqualifying interest rests on the party making that assertion.  *See Wolkenstein v.*

*Reville*, 694 F.3d 35, 41-42 (2d Cir. 1982).

Jaeger's participation as an intervenor before the Council does not mean she necessarily

received a "fair hearing."  *See Wojchowski v. Daines*, 498 F.3d 99, 102-03 (2d Cir. 2007)

(holding that the term "fair hearing" is a term of art used to describe a judicial or administrative

hearing conducted in accordance with due process, but simply because a statute or regulation sets

forth a series of procedures that it deems a fair hearing does not guarantee that due process is

met.).  There is "a presumption of honesty and integrity in those serving as adjudicators."

*Withrow v. Larkin*, 421 U.S. 35, 47 (1975).   A due process violation may, however, be

established without a showing of actual bias where "a court . . . determin[es] from the special

facts and circumstances present in the case before it that the risk of unfairness is intolerably

high."  *Id.* at 58; *see also Greenberg v. Board of Governors of the Federal Reserve System*, 968

F.2d 164, 167 (2d Cir. 1992).

The potential conflict of interest built into the Council's funding mechanism raises

serious concerns, especially with respect to the Council's role as adjudicator.  The funneling of

funds directly from industry-parties to the purse of the Council can undercut the necessary

impartiality that due process dictates.  Indeed, neighboring New England states have promulgated

similar regulatory authorities but have developed funding mechanisms without such apparent

conflicts of interest.  For instance, the state of Massachusetts has a three-member

Commonwealth Utilities Commission.  The three members are salaried employees.  *See*

M.G.L.A. 25 § 2.  The Commission has authority to levy assessments against industry

participants, but the assessments are paid into the state's General Fund.  Additional assessments

may be levied to recover indirect operating expenses of the Commission but the monies are

collected by the Department of Public Utilities.  *See* M.G.L.A. 25 § 18.  Rhode Island's energy

facility siting board consists of the chairperson of the public utilities commission, the director of

the department of environmental managements, and the associate director of administration for

planning.  The board members serve without compensation and are reimbursed only for expenses

incurred in performance of their actual duties.  *See* RI Stat. § 42-98-5(c). The board has access to

$100,000 in funds to offset the costs of hiring expert witnesses, legal counsel and the like, in the

performance of its duties. The board can set reasonable fees collected from applicants to offset

the cost of administration.  The fees are paid to the general treasury.  *See* RI Stat. § 42-98-17.   In

both of these examples, the decisionmaker does not have a personal financial interest in the

number of applications filed nor in ensuring that wireless facilities are approved and become fee-

payers.

　　　　For the reasons set forth above, I have reservations about the constitutionality of section

16-50v.  The Supreme Court has cautioned, however, that courts should exercise judicial restraint

and refrain from premature interpretations of statutes.  *See Washington State Grange v.*

*Washington State Republican Party*, 552 U.S. 442, 450 (2008).  Courts should not "anticipate a

question of constitutional law in advance of the necessity of deciding. . . ."  *Id.*  I do not reach the

merits of Jaeger's claim concerning section 16-50v because it is unnecessary to do so.  Here, at

the core of Jaeger's due process claim is an allegation that the Council failed to give proper

weight to her arguments concerning RF emissions.  Regardless of any conflict of interest the

funding mechanism of section 16-50v creates, the Council could not have rendered a siting

decision on the basis of RF emissions as proposed by Jaeger.  Because the relief that Jaeger seeks

and the basis for that relief is barred by the TCA, she fails to demonstrate that under the

circumstances of this case she presents a due process claim on which relief can be granted.   If I

held that section 16-50v violates due process rights of intervenors such as Jaeger, the most Jaeger

could accomplish is a remand to a panel unaffected by conflict for reconsideration of her

arguments.  Such a remand would be futile, because the relief Jaeger seeks is barred under the

TCA.  Accordingly, Jaeger's sixth claim for relief is dismissed.

IV.     <u>Conclusion</u>

        For the foregoing reasons, defendants' motions to dismiss (docs. ## 16, 23) are granted.

Plaintiff's cross-motion for summary judgment (doc. # 25) is denied as moot.

It is so ordered.

        Dated at Bridgeport, Connecticut, this 15th day of March 2010.


                                                /s/ Stefan R. Underhill
                                                Stefan R. Underhill
                                                United States District Judge